**Willie D. PHILLIPS, et al., Plaintiffs,**

v.

**AMOCO OIL COMPANY, corporation, et al., Defendants.**

**Civ.A. CV80–L–1416–S.**

United States District Court,
N.D. Alabama, S.D.

June 18, 1985.*

---

* This opinion was prepared by Michael R. Pennington, Law Clerk. Its excellence is self-evident. It accurately reflects the considered judgment of the Court as to each issue discussed therein. Its analysis of the massive materials produced during four years of discovery enables

the Court confidently to conclude that there is no genuine issue as to any material fact and that each defendant is entitled to judgment as a matter of law.

698

J. Gusty Yearout, G. Thomas Yearout, Yearout, Hardy & Myers, P.C., Birmingham, Ala., for plaintiffs.

William B. Hairston, Engel, Hairston, Moses & Johanson, Stephen E. Brown, James P. Alexander, Bradley, Arant, Rose & White, Birmingham, Ala., for defendants.

## MEMORANDUM OF OPINION

LYNNE, Senior District Judge.

This is an action seeking the recovery of specified employee benefits, together with compensatory and punitive damages. It stems from the sale of a liquid propane gas operation by defendant Amoco Oil Company ("Amoco") to defendant Northern Propane Gas Company ("Norgas"). The plaintiffs have cast their net wide, alleging that the sale violated no less than eight sections of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.* Moreover, in apparent recognition of the fact that such a wide net is bound to develop a few holes, the plaintiffs have tacked on certain state law claims as well. The jurisdiction of the Court is invoked under 29 U.S.C. § 1132, and the doctrine of pendent jurisdiction.[1]

After numerous pleading amendments and four years of extensive discovery, the

1. The defendants have also asserted diversity jurisdiction under 28 U.S.C. § 1332, and the doctrine of fraudulent joinder jurisdiction.

legal sufficiency of these claims may now be tested. Both Amoco [2] and Norgas have moved for summary judgment based upon the pleadings, affidavits, depositions, stipulations and other documents now on file.[3] Upon careful review of the record as it now stands, the Court is convinced that all defendants are entitled to judgment as a matter of law on each and every claim asserted by the plaintiffs.

## BACKGROUND

The following facts are undisputed. In the years before 1979, Amoco operated a business, in Alabama and elsewhere in the southeastern United States, which sold liquid propane gas ("LPG"). Each of the plaintiffs in this action was an employee of Amoco working in the LPG operation in Alabama. As employees of Amoco, the plaintiffs were eligible to participate in the Employee Retirement Plan of Standard Oil Company and Participating Companies (hereinafter referred to as "the Standard Plan" or "the Amoco Plan"). Prior to May, 1979, Amoco began to seek a purchaser for its Southeastern LPG operations. On May 4, 1979, defendant Norgas submitted an offer to purchase Amoco's LPG facilities in the southeastern United States, contingent upon approval of the Board of Directors of its parent company. In that offer, Norgas specifically noted that retirement benefits for LPG employees who became employees of Norgas would be based on their years of service with Norgas. In other words, Norgas' initial offer to purchase the Amoco operations contemplated that, although years of service with Amoco would be recognized by Norgas for certain employee benefit purposes, those prior years of service would not be recognized for benefit accrual purposes under the Norgas retirement plan.

By a letter dated May 10, 1979, Amoco accepted Norgas' offer. Amoco and Norgas then exchanged information and negotiated the definitive agreement. The parties signed the final sale contract on July 31, 1979. Section 2.5 of the sale contract provided in part:

> Buyer [Norgas] agrees to offer employment to each regular full-time employee of Seller [Amoco] presently assigned to the business represented by the various assets subject to this Contract, except employees on long-term and/or permanent disability ... upon the following conditions: current salary and appropriate salary administration plan will be recognized; ... retirement benefits under the Buyer's Retirement Income Protection Plan will be based on years with Buyer except that continuous years of service with Seller immediately prior to the transfer date shall be credited by Buyer for vesting purposes....

The sale of Amoco's LPG operations to Norgas was closed effective 12:01 A.M. on September 4, 1979. The former Amoco employees, including plaintiffs, began their employment with Norgas on that date. Immediately after the sale of Amoco's LPG operations to Norgas, each plaintiff had the same job responsibilities and was compensated at the same rate of pay as he had enjoyed at Amoco. Exactly one year later, on September 4, 1980, this action ensued.

In this action, plaintiffs have spun a tangled web of arguably related and intertwined claims, portions of which are intended to trap Amoco alone, and other portions of which are intended to ensnare both Amoco and Norgas.[4] The substance of these claims ranges from the honestly debatable to the utterly amorphous. The plaintiffs' failure to filter out the latter has rendered

---

**2.** Joe D. Bearden, a resident of Alabama and a former employee of Amoco, is also named as a defendant in this action. Bearden has joined in Amoco's motion for summary judgment. The plaintiffs have not attempted to distinguish between Amoco and Bearden for purposes of this motion, nor will the Court do so.

**3.** This action was originally brought by the named plaintiffs as a class action. However, to date, no class has been certified. At the request of counsel, and with their mutual assent, the Court has proceeded to address the summary judgment motions at this time.

**4.** None of plaintiffs' claims are made against Norgas alone.

this litigation far more burdensome and unwieldly for the parties and the Court than it might otherwise have been.

First, the plaintiffs allege a number of state law claims. Thus, plaintiffs claim that at various times Amoco made misrepresentations regarding plaintiffs' future job security, the security of their employee benefits, and the existence of plans by Amoco to divest itself of the LPG operation, thereby inducing plaintiffs to remain "in place" so as to enhance the value of Amoco's LPG operation as a salable "going concern." (Pretrial Order at 10–11). Moreover, plaintiffs allege that they had contracts for lifetime employment with Amoco, which Amoco breached when it sold the going LPG operation to Norgas and terminated plaintiffs' association with Amoco. (Pretrial Order at 10). Finally, plaintiffs claim that Amoco and Norgas conspired to misrepresent certain facts regarding the Amoco-Norgas sale—specifically, the fact that plaintiffs' years of service with Amoco would not be credited by Norgas for purposes of calculating retirement benefits under the Norgas retirement plan. (Pretrial Order at 12).

Although the state law claims are asserted vigorously by the plaintiffs, the heart of this litigation consists of a veritable barrage of ERISA claims. Plaintiffs contend that the terms of the Amoco-Norgas sale and the manner in which it was negotiated and effectuated violated at least eight sections of ERISA: 29 U.S.C. § 1022, § 1024, § 1056, § 1060, § 1104, § 1106, § 1140, and § 1141.

In the face of these allegations, the defendants contend that, based upon an extensive record developed through four years of ample discovery, defendants are entitled to judgment as a matter of law with respect to each of the plaintiffs' claims. For the reasons set forth below, the Court must agree with the defendants.

## DISCUSSION

### I. The State Law Claims

#### A. Lifetime Employment Contract

■ The Court will first address the state law claims, which may be disposed of without reaching the merits. The first of these claims concerns an alleged "lifetime employment contract" between plaintiffs and Amoco. Amoco has fervently denied entering into any lifetime employment contracts with the plaintiffs. However, assuming for purposes of this motion that such contracts existed, it is apparent as a matter of law that they were not breached on the undisputed facts of this case.

Although lifetime employment contracts are relatively rare in industry today, they do exist and they have been recognized by several states to be valid and binding. Generally, of course, the typical employment contracts which contain no fixed period of employment are construed as terminable at will by either party. See Peacock v. Virginia-Carolina Chemical Co., 221 Ala. 680, 130 So. 411 (1930). Under certain circumstances, however, employment contracts which purport to be terminable only at the will of the employee will be held to create a valid and binding contract of "permanent" or "lifetime" employment in favor of the employee. See Alabama Mills, Inc. v. Smith, 237 Ala. 296, 186 So. 699 (1939). Nevertheless, Alabama law on this question follows that of most other states which recognize lifetime employment contracts, and holds that there are certain limitations implied by law with regard to such contracts. Specifically, even where a lifetime employment contract is legally enforceable, the law implies the condition that the contract lasts only so long as the employer remains in the business for which the employee was hired and needs the particular services the employee was hired to perform. Alabama Mills, 186 So. at 701, 702. Accord, Bates v. Jim Walter Resources, Inc., 418 So.2d 903, 906 (Ala.1982); United Security Life Ins. Co. v. Gregory, 281 Ala. 264, 201 So.2d 853, 854–55 (1967); Jordan v. Mallard Exploration, Inc., 423 So.2d 896, 898–99 (Ala.App.1982).

In the present case, it is undisputed that Amoco sold its retail LPG business to Norgas, and abandoned the retail LPG busi-

ness in Alabama. Prior to the sale, the various plaintiffs had held positions as salesmen, sales office supervisors, and sales and service representatives in various retail sales branches of Amoco's LPG operations.[5] After the sale, it is uncontroverted on the record that Amoco no longer engaged in the retail sales of liquid propane, and no longer needed the services the plaintiffs had been hired to perform.[6] This being so, the above-cited authorities make it clear as a matter of law that Amoco is entitled to summary judgment on the plaintiffs' claims for breach of lifetime employment contracts. Even assuming that such contracts were made, they were not breached, since they terminated as a matter of law when Amoco left the retail LPG business in Alabama. *Cf. Jordan v. Mallard Exploration, Inc.*, 423 So.2d at 897–99.

The plaintiffs attempt in vain to escape the burden of the long line of precedents mandating this result. First, the plaintiffs argue that Amoco still does some business in Alabama, and that even after leaving the business of retail sales of liquid propane, Amoco was under a contractual duty to transfer the plaintiffs to some other type of work in some other division of Amoco's operations. *Alabama Mills* and its progeny are inapplicable, they argue, because in those cases the employer no longer had work of any kind for the terminated employees to perform.

The plaintiffs labor against the current. Under Alabama law, a lifetime employment contract lasts only so long as the employer remains in the particular business for which the particular employee was hired. Thus, in *Alabama Mills*, the court stated:

> A leading case upon [the] subject [of lifetime employment contracts] is *Carnig v. Carr*, 167 Mass. 544, 46 N.E. 117.... It was said that what they meant by a permanent employment was so long as defendant was engaged in the *same nature of business* and needed the service

of *such an employee,* and plaintiff was able and willing to do it satisfactorily and gave no cause for his discharge.

. . . . .

> If [the employee] has purchased a contract by which his employer leaves the period of duration to him, it resembles the purchase of other sorts of option rights, subject to the limitation impliedly included THAT the employer *shall continue in such business and need the things to be done, which the employee is to do.* In other words, such employee must have a preference over others in doing *that sort of work.*

*Alabama Mills,* 186 So. at 701, 702 (emphasis supplied).

Thus, in order for the principle of *Alabama Mills* to apply, it is not necessary that the employer go out of business totally. Rather, it is sufficient that the employer is no longer engaged in the business for which the particular employee is hired, and thus no longer in need of the particular services the employee was hired to perform. This is further confirmed by the decision of the Alabama Supreme Court in *Bates v. Jim Walter Resources, Inc.*, 418 So.2d 903 (1982). There, the plaintiff alleged that he had entered into a contract of lifetime employment with the defendant. In reliance on this alleged contract, the plaintiff had resigned from another job. Before she reported for work with the defendant, however, "economic conditions caused [the defendant] to institute an austerity program, which included a hiring freeze." 418 So.2d at 904. Pursuant to this program, the plaintiff was terminated. In the plaintiff's subsequent suit for breach of a lifetime employment contract, the Alabama Supreme Court affirmed the trial court's grant of summary judgment based upon proof that the employer no longer needed the services for which the plaintiff had initially been hired,[7] even though the employer had not gone out of

---

**5.** *See* Pretrial Order at 6, 8.

**6.** *See* Affidavit of Larry J. Boyd.

**7.** This was one of two alternative bases for the Supreme Court's affirmance, the other being that no lifetime contract existed in any event. *See Bates,* 418 So.2d at 906.

business altogether. After quoting *Alabama Mills*, the Court stated:

Thus, according to the above definition, an implicit term of the employment contract was that the employee would remain employed only if the employer had need of the employee's services. The trial court correctly found that Bates was terminated because [the defendant] did not need Bates' services or the services of other new employees at that time.

418 So.2d at 906.

In the instant case, then, it is legally immaterial that Amoco continued to engage in some types of business in Alabama following the sale of its LPG operations to Norgas. The salient point is whether Amoco continued to engage in the business for which the plaintiffs were hired and continued to need the services which plaintiffs were hired to perform. As to that point, there is no dispute of material fact in the record. Following the Amoco-Norgas transaction, Amoco was no longer in the retail LPG business, and no longer needed the plaintiffs' services as LPG retail sales personnel.[8]

Similarly flawed are the plaintiffs' attempts to sidestep the plain import of *Alabama Mills* and its progeny by claiming that they were never told "that they would have a job with Amoco [only] until Amoco decided to sell its facilities." (Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment, p. 5). Under Alabama law, all lifetime contracts terminate as a matter of law when the employer ceases to engage in the business for which the employee is hired. There is no requirement that the employee be notified of this possibility in advance or that the term be expressed in the contract itself[9]—rather, the term is *implied by law* into *every* contract of lifetime employment governed by Alabama law.

The plaintiffs have adduced no evidence tending to establish that Amoco continues to engage in the business for which they were hired, and no evidence that Amoco continues to need the services which plaintiffs were hired to perform. Thus, based on the record before the Court, it is clear that there exists no genuine issue of material fact with regard to the plaintiffs' claims for breach of lifetime employment contracts. The Court concludes that defendants are entitled to judgment as a matter of law with respect to these claims.

### B. *The Fraud Claims*

■ The plaintiffs next allege two discrete claims of fraud—one against Amoco alone and the other against both Amoco and Norgas. First, the plaintiffs allege fraud with respect to their continued employment by Amoco. In substance, the plaintiffs contend that Amoco falsely represented that the LPG operation would not be sold, that plaintiffs' jobs and benefits were secure, and that benefits would only be lost if plaintiffs voluntarily terminated their employment with Amoco or if plaintiffs failed to properly perform their jobs. (Pretrial Order at 10–12).[10] Second, plain-

---

**8.** Plaintiffs have alleged that Amoco did in fact transfer some managerial employees formerly employed in the LPG operation to other Amoco divisions and operations in Alabama. This is of little relevance to the legal issue at hand. For our purposes, Amoco was under no contractual duty to transfer particular employees to new positions unrelated to the work for which they were initially hired. *See Alabama Mills; Bates.* However, nothing in *Alabama Mills* or its progeny prohibits an employer from voluntarily transferring and retaining employees where it is feasible to do so.

**9.** The rule of *Alabama Mills* should not be confused with the defense of "impossibility of performance." As noted in *City of Albertville v.*

*United States Fidelity & Guaranty Co.,* 272 F.2d 594 (5th Cir.1959), Alabama law has traditionally refused to recognize the "impossibility of performance" as a defense to a contract action, subject to certain limited exceptions. *See also Mayo v. Andress,* 373 So.2d 620 (Ala.1979); *Capital Fertilizer Co. v. Ashcraft-Wilkinson Co.,* 202 Ala. 92, 79 So. 484, 487 (1918). In the case at hand, however, Amoco does not rely on an "impossibility of performance" defense. Rather, Amoco relies on the fact that the contracts, if they exist at all, terminated by virtue of their own terms (albeit terms implied by law) when the LPG operation was sold.

**10.** In addition to this claim for fraud against Amoco as an entity, plaintiffs have also claimed

tiffs allege that Amoco and Norgas conspired to defraud the plaintiffs by misrepresenting material facts concerning the terms of the Amoco-Norgas sale (Pretrial Order at 12). Specifically, plaintiffs claim that defendants conspired to misrepresent the fact that plaintiffs' years of service with Amoco would not be credited by Norgas in calculating plaintiffs' retirement benefits under the Norgas retirement plan. As will be demonstrated, both of these fraud claims are legally deficient.

### 1. Fraud Concerning Continued Employment with Amoco.

■ Turning first to the claim of fraud with respect to plaintiffs' continued employment with Amoco, it is apparent from the record that these claims are barred by the applicable statute of limitations. Fraud actions are governed by a one-year statute of limitations under the law of Alabama. *Ala.Code* (1975) § 6-2-39. *See also Papastefan v. B & L Construction Co. of Mobile*, 385 So.2d 966 (Ala.1980). However,

> [i]n actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his action.

*Ala.Code* (1975) § 6-2-3. In applying this "savings statute"

> [t]he 'fact constituting the fraud' is deemed to have been discovered when it

ought to have been discovered; that is, at the time of the discovery of facts which would provoke inquiry by a person of ordinary prudence and which, if followed up, would have led to the discovery of the fraud.

*Moore v. Merchants & Planters Bank*, 434 So.2d 751, 754 (Ala.1983), *quoting Papastefan v. B & L Construction Co., Inc.*, 385 So.2d 966 (Ala.1980). *Accord, Pines v. Warnaco, Inc.*, 706 F.2d 1173 (11th Cir. 1983); *Sexton v. Liberty National Life Ins. Co.*, 405 So.2d 18, 21 (Ala.1981); *Seybold v. Magnolia Land Co.*, 376 So.2d 1083, 1087 (Ala.1979). In other words, the statute of limitations for fraud and misrepresentation effectively begins to run when the plaintiff "has either actual knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." *Cf. First Federal Savings and Loan Ass'n of Miami v. Mortgage Corp. of the South*, 650 F.2d 1376, 1378 (5th Cir. Unit B 1981). *Accord, Willcutt v. Union Oil Co. of California*, 432 So.2d 1217 (Ala.1983); *Moulder v. Chambers*, 390 So.2d 1044 (Ala.1981); *Cities Service Oil Co. v. Griffin*, 357 So.2d 333 (Ala.1978); *Johnson v. Shenandoah Life Ins. Co.*, 291 Ala. 389, 281 So.2d 636 (1973); *State Security Life Ins. Co. v. Henson*, 288 Ala. 497, 262 So.2d 745 (1972). *See also Moss v. Davitt*, 244 Ala. 513, 52 So.2d 515 (1951). More specifically, where (as here) the alleged misrepresentations related to future actions or conduct of the

---

that "[t]he defendant Amoco Oil Company by and through its agents, servants, and employees and executives conspired to defraud the plaintiffs" with respect to the security of their jobs and benefits. (Pretrial Order at 12). This allegation fails as a matter of law. Under the law of conspiracy in general, and the law of Alabama in particular, a civil conspiracy to commit a tort requires a combination of two or more persons and cannot exist between a corporation and its agents or employees, since the acts of agents and employees acting within the line and scope of their employment are considered the acts of the corporation itself. *See Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Tuskegee Institute v. May Refrigeration Co., Inc.*, 57 Ala.App. 344, 328

So.2d 598 (1976), *affirmed in part, reversed in part on other grounds* 344 So.2d 156 (Ala.1977). *Accord, Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.1976), *cert. denied* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Pearson v. Youngstown Sheet & Tube Co.*, 332 F.2d 439 (7th Cir.1964), *cert. denied* 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 185 (1964); *Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47 (10th Cir.1963); *Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.*, 497 F.Supp. 513 (M.D.Fla.1980). This is only logical, since a corporation is a fictional entity and capable of acting only through its agents and employees. Thus, insofar as the plaintiffs seek recovery for a conspiracy between Amoco and its agents and employees, the claim is legally precluded, and Amoco is entitled to judgment as a matter of law.

defendant, the Alabama Supreme Court has held that the limitations period will be deemed to have commenced at the time "[w]hen Plaintiff first learned that Defendant did not intend to perform as represented." *Retail, Wholesale and Department Store Employees Union, Local 453 v. McGriff,* 398 So.2d 249, 252 (Ala.1981). *Accord, Fuqua v. Barbe,* 376 So.2d 202, 203–04 (Ala.Civ.App.1979), *cert. denied* 376 So.2d 205 (Ala.1979).[11]

■ In the case *sub judice,* Amoco's alleged representations that the LPG operations would not be sold, and that plaintiffs' jobs and benefits would not be lost or terminated, were clearly representations concerning future actions or conduct of the defendant. Since it is undisputed that all plaintiffs had actual knowledge of the Norgas sale—and hence actual or constructive knowledge that Amoco did not intend to perform as represented—no later than August 21, 1979,[12] the statute of limitations on these claims expired, at the latest, on August 21, 1980. *McGriff,* 398 So.2d at 252. *Fuqua v. Barbe,* 376 So.2d at 203–04. Since this lawsuit was not filed until September 4, 1980, these claims of fraud concerning job and benefit security with Amoco are clearly time-barred under *Ala. Code* (1975) §§ 6–2–39 and 6–2–3.

Plaintiffs insist, however, that their causes of action for fraud relating to their continued employment with Amoco did not accrue until September 4, 1980, when the sale was officially closed and they ceased to be employed by Amoco. Although the plaintiffs did not allege that these representations induced them to accept employment with Amoco in the first place, they do assert that they relied on Amoco's representations concerning their continued employment by staying "in place" in their jobs. Even though they were aware of the Amoco-Norgas sale by August 21, 1979, the plaintiffs insist that they suffered no legal injury as a result of their *previous* reliance on Amoco's misrepresentations until they were actually taken off the Amoco payroll.

■ It is generally true, as plaintiffs assert, that damage is an essential element of a fraud action. "In equity, as at law, with the exception of special cases in some jurisdictions, fraud will not be relieved against unless it is shown that injury resulted *or will result* to the complainants as a consequence of said fraud." *Smith v. Smith,* 266 Ala. 118, 94 So.2d 863, 868 (1957) (emphasis supplied). However, as *McGriff* and *Fuqua* make clear, where the fraud alleged involves representations of intended future action or conduct by the defendant, the statute of limitations begins to run when the plaintiff first learns that the defendant does not intend to perform as represented, regardless of whether the plaintiff's injury has already resulted or whether it is only substantially certain to result at a specified time in the future. Thus, in *McGriff,* the plaintiff claimed that he was told by his plant manager and his union steward that he would receive a pension benefit at age 55 if he "stayed on the payroll" for 15 years and joined the union, and that in 1959 in reliance on these representations, he accepted employment with the defendant

---

**11.** Misrepresentations as to future acts and events are actionable under Alabama law in certain circumstances. *See Walter v. Woodall,* 288 Ala. 510, 262 So.2d 756 (1972); *Ellis v. Zuck,* 409 F.Supp. 1151, 1158 (N.D.Ala.1976), *affirmed* 546 F.2d 643 (5th Cir.1977).

**12.** On August 21, 1979, Amoco and Norgas held a meeting with Amoco LPG employees in Boaz, Alabama, to discuss the terms of the Amoco-Norgas sale contract and its effect on their jobs and benefits. It is entirely undisputed that no later than August 21, 1979, every plaintiff had actual as well as constructive knowledge of the fact that Amoco's LPG operations were being sold, that plaintiffs were being terminated by Amoco, and that each of the plaintiffs would become an employee of Norgas and be covered by Norgas benefit plans when the sale was completed. (*See* Deposition of Davis at 31–33; Deposition of Fennell at 15, 35, 37–38, 43; Deposition of Gardner at 22–23; Deposition of Gurley at 26–27, 29–30; Deposition of Jones at 37–39; Deposition of Lovell at 35–38; Deposition of McClendon at 38–40, 51; Deposition of Moore at 34, 38–39; Deposition of Murphree at 35–36; Deposition of Owens at 39–40; Deposition of Phillips at 69–70, 73–74, 77–78; Deposition of Pinyan at 51–54; Deposition of Shaneyfelt at 24–26; Deposition of Shrader at 42–43, 48; Deposition of Sims at 27–28; Deposition of Weaver at 30–33).

company and joined the defendant union. In 1970, plaintiff was injured during the course of his employment. Thereafter, he was paid workmen's compensation benefits for approximately six years by his employer's workmen's compensation carrier, but remained on the payroll and received one annual vacation pay check for each of the years 1971 through 1975. In 1973, plaintiff learned that the employer had ceased making payments into the pension fund on his behalf in 1970. In 1978, the plaintiff sued the employer and the union for breach of contract and fraud. However, despite the obvious fact that McGriff would not have been eligible to receive pension benefits until sometime after 1975, the Supreme Court of Alabama held unequivocally that his cause of action for fraud accrued in 1973, when it became clear that he would not be paid a pension in the future as promised:

> When Plaintiff first learned that Defendant did not intend to perform as represented, the statute began to run. *Fugua (sic) v. Barbe,* 376 So.2d 202 (Ala. Civ.App.1979), cert. den. 376 So.2d 205 (Ala.1979). Consequently, appellee's cause of action first accrued when he received the letters above set forth, representing Appellant's position *vis-a-vis* Appellee's right to a pension. From that date, January 24, 1973, Plaintiff had one year within which to file his cause of action bottomed on allegations of fraud by Appellant's officers.... Plaintiff's complaint, to which the fraud claim was added by amendment, was filed in April 1978, far beyond the one year after discovery period allowed by § 6–2–3.

*McGriff,* 398 So.2d at 252.

The same rule was stated in *Fuqua v. Barbe.* There, plaintiff alleged fraud as to a promise to repair defective construction. The plaintiff had given no consideration in exchange for this promise, and had not altered his position to his detriment. The court held that defendant was entitled to judgment notwithstanding the verdict, because plaintiff's fraud claim was untimely. The court stated:

> The fraud of defendant claimed by plaintiff is not the extent of an original defective performance in construction, but is the making of a commitment to repair such defects which he did not intend to perform. *When plaintiff first learned that defendant did not intend to perform as represented, the statute began to run.*

376 So.2d at 203–04 (footnote omitted; emphasis supplied).

These cases control as to the fraud allegations relating to continued employment of the plaintiffs by Amoco and the receipt of Amoco employee benefits. The alleged misrepresentations related to future performance by Amoco. Even if the representations were made as alleged by plaintiffs, all of the plaintiffs knew by August 21, 1979, that Amoco did not intend to live up to the representations. They knew then that Amoco had sold the LPG operation to Norgas, and they knew that they would be terminated by Amoco. Therefore, the statute of limitations on this fraud claim began to run no later than that date.[13] The present lawsuit was filed on September 4, 1980, and this fraud claim is therefore untimely as a matter of law.

■ Even if the date of injury is the relevant date, however, the plaintiffs' claims are still barred. It must be remem-

**13.** Plaintiffs' knowledge of the sale by August 21, 1979, not only constituted actual knowledge of the fact that Amoco did not then intend to perform as represented, but it also put plaintiffs on inquiry notice of the possibility that Amoco's representations concerning the plaintiffs' job security were made with a contemporaneous intention to deceive or not to perform as promised. *See Moore v. Merchants & Planters Bank,* 434 So.2d at 754 (fact constituting the fraud deemed discovered at the time of discovery of facts which would provoke inquiry by a person of ordinary prudence and which, if followed up, would have led to the discovery of the fraud). *Cf. McGriff,* 398 So.2d at 252 (fraud with respect to future acts or events deemed discovered when plaintiff first learns that defendant does not intend to perform as represented). *Compare Walter v. Woodall,* 288 Ala. 510, 262 So.2d 756 (1972) (fraud with respect to future actions or events requires contemporaneous intent to deceive or not to perform as promised).

bered that the claim we are concerned with here is a fraud claim, not a breach of contract claim.[14] The damage which is essential to a fraud action is damage *"proximately resulting from [plaintiff's] reliance." First Virginia Bankshares of Benson,* 559 F.2d 1307, 1313 (5th Cir.1977), cert. denied 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) (emphasis supplied); *Ellis v. Zuck,* 409 F.Supp. 1151, 1157–59 (N.D.Ala.1976), *affirmed* 546 F.2d 643 (5th Cir.1977). In the case at hand, the only reliance alleged by plaintiffs is that they remained "in place." (Pretrial Order at 11–12; Transcript of February 25, 1985 Hearing at 21). However, the plaintiffs have consistently failed to identify any damage they might have suffered which could fairly be said to have proximately resulted from this "act" of reliance. Certainly the loss of Amoco employment and benefits did not result from their staying "in place." Indeed, if the plaintiffs had not stayed "in place," they would still have lost their Amoco benefits and their status as Amoco employees. Therefore, even if the plaintiffs are correct—that even where the fraud alleged concerns assurances of future action by the defendant, the statute of limitations does not begin to run until the plaintiff suffers damage as a proximate result of his reliance on the misrepresentations—their claims are barred. The loss of their jobs did not proximately result from plaintiffs' reliance on the defendant's misrepresentations and thus is irrelevant to the commencement of the limitations period. To the extent that staying "in place"

did constitute damage or result in damage of some other kind to the plaintiffs—for instance, the deprivation of an opportunity to negotiate the terms of the sale or to seek other employment[15]—that damage must have occurred prior to August 21, 1979, when the plaintiffs learned of the sale. After that time, the plaintiffs could not have acted or failed to act in justifiable reliance upon any representations by Amoco concerning the security of their jobs and benefits or the existence of plans to sell the LPG operation. It seems, then, that the plaintiffs are posed a conundrum of sorts. Either the fraud allegedly perpetrated upon them did not proximately result in damage to them at all, in which case their claims fail for lack of an essential element, or the plaintiffs suffered damage prior to August 21, 1979, and their claims are time-barred.[16]

Thus, even assuming that plaintiffs suffered some damage as a proximate result of their reliance upon the alleged misrepresentations concerning future employment with Amoco, the Court concludes that Amoco is entitled to judgment as a matter of law with respect to this fraud claim based upon the statute of limitations.

2. Fraud Concerning the Terms of the Amoco-Norgas Sale.

■ With regard to the common law claims for fraud and conspiracy to defraud made against both Amoco and Norgas, the plaintiffs allege that Amoco "did fraudulently misrepresent ... that years of service would be accumulated toward retire-

---

14. The plaintiffs' breach of contract claims are separate and distinct and have been dealt with *supra.*

15. At oral argument on these motions, counsel for plaintiffs argued that the deprivation of an opportunity to take concerted job action or participate in the negotiations concerning the terms of the sale constituted damage suffered by the plaintiffs in reliance on Amoco's misrepresentations. (Transcript of February 25, 1985 Hearing at 22–23).

16. Even where the date of injury is relevant, it is well-established that a cause of action in tort accrues (and the limitations period begins to run) as soon as the plaintiff suffers any damage

as a result of the fraud, regardless of whether additional damages are incurred later which were not apparent at or fixed at the time of first legal injury. *See, e.g., Home Ins. Co. v. Stuart-McCorkle, Inc.,* 291 Ala. 601, 285 So.2d 468, 473 (1973). Since the plaintiffs have argued that the damage they suffered included the deprivation of an opportunity to take concerted job action, seek other employment, or participate in the negotiations concerning the sale, *see* n. 15, *supra,* and since that damage necessarily occurred prior to August 21, 1979, when plaintiffs learned of the Amoco-Norgas sale, it is plain that the statute of limitations precludes the fraud claims at issue here.

ment, [and] that retirement benefits and the right to early retirement would be protected." (Pretrial Order at 10). Plaintiffs also allege that Amoco and Norgas conspired to misrepresent material facts about the terms of the Amoco-Norgas sale in order to "deceive the employees about the fact that years of service for retirement and pension purposes would not transfer to Norgas." (Amended Complaint of June 25, 1982, at par. 6; *see also* Pretrial Order at 12). In other words, the thrust of these claims is that Amoco and Norgas misrepresented or failed to disclose [17] the true terms of the Norgas benefit plan and the plaintiffs' rights under that plan.

Viewed in this light, it becomes plain that no recovery may be had upon these state law fraud claims unless the right to such recovery arises under ERISA. Section 514 of ERISA, 29 U.S.C. § 1144(a), preempts all state laws that "relate to" any employee benefit plan:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede *any and all* state laws *insofar as they may now or hereafter relate to* any employee benefit plan described in § 1003(a) of this title and not exempt under § 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis supplied). The only state laws expressly exempted from ERISA's broad preemptive sweep are those laws regulating insurance, banking and securities, and criminal laws of general application. 29 U.S.C. § 1144(b).

In light of this express Congressional declaration of preemptive intent, the Court need not determine whether and to what extent state law fraud and misrepresentation principles might conflict with or alter the requirements of ERISA. *See Brown v. Hotel & Restaurant Employees & Bar-*

*tenders International Union Local 54,* — U.S. —, —––—, 104 S.Ct. 3179, 3185–86, 82 L.Ed.2d 373, 382–83 (1984); *Fidelity Federal Savings & Loan Assoc. v. De La Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). The import of the statutory language cannot be mistaken. As the Supreme Court stated in *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981), ERISA was "meant to establish pension plan administration as exclusively a federal concern."

Recently, in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court confirmed ERISA's broad preemptive sweep and further confirmed that the term "relate to" as used in the Act was to be given a liberal and broad interpretation. As noted by the Court, it was the intent of Congress to eliminate all possibility of conflict with state law principles and to make the field of employee benefit plans exclusively federal in nature. 463 U.S. at 99–100, 105, 103 S.Ct. at 2901–02, 2904. Indeed, Congress considered and rejected a proposal to limit the preemptive scope of the statute to the specific areas and issues concerning employee benefit plans directly regulated by ERISA's express provisions, reasoning that "[s]uch a formulation raised the possibility of endless litigation over the validity of state action that might impinge on the federal regulatory scheme." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. at 99–100, n. 20, 103 S.Ct. at 2901–02, n. 20 (1983), *quoting* 120 Cong.Rec. 29942. *See also Hewlett-Packard Co. v. Barnes,* 425 F.Supp. 1294, 1298–1300 (N.D.Cal.1977), *affirmed* 571 F.2d 502 (9th Cir.1978), *cert. denied* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *In re C.D. Moyer Co. Trust Fund,*

---

**17.** It appears that the plaintiffs' claims of fraud with respect to the crediting of service are actually based upon nondisclosure of information rather than affirmative misrepresentation. (*See* Amended Complaint of June 25, 1982, at pgh. 56). Thus, several plaintiffs repeatedly testified that they were never told that Amoco service *would* be credited under the Norgas retirement plan. (Davis Deposition at 41; Fennell Deposi-

tion at 58–59; Gurley Deposition at 39–40; Jones Deposition at 65; McClendon Deposition at 51–53). Of course, four of the plaintiffs admitted that they were told the truth concerning credit for Amoco service under the Norgas plan—*i.e.,* that such service would *not* be credited. (Gardner Deposition at 22; Lovell Deposition at 37–38; Shaneyfelt Deposition at 26; Weaver Deposition at 35).

441 F.Supp. 1128, 1130–31, n. 4 (E.D.Pa. 1977), *affirmed* 582 F.2d 1273 (3d Cir. 1978). Thus, the settled construction of 29 U.S.C. § 1144(a) is that it preempts not only state laws dealing with the subject matters directly covered by ERISA, but also any state laws which "relate" either directly or indirectly to an employee benefit plan. *Shaw v. Delta Air Lines,* 463 U.S. at 98–100, 103 S.Ct. at 2902; *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. at 525, 101 S.Ct. at 1907. *Accord, Wadsworth v. Whaland,* 562 F.2d 70 (1st Cir.1977), *cert. denied* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978); *District 65, UAW v. Harper & Row Publishers, Inc.,* 576 F.Supp. 1468 (S.D.N.Y.1983). *See generally American Progressive Life and Health Ins. Co. of New York v. Corcoran,* 715 F.2d 784 (2d Cir.1983); *Bucyrus-Erie Co. v. Dept. of Industry, Labor and Human Relations,* 599 F.2d 205 (7th Cir.1979), *cert. denied* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

In the instant case, it is clear that the state law claims of fraud and conspiracy to defraud relating to the terms of the Amoco-Norgas sale are preempted. As noted above, the thrust of these claims is the failure to accurately report or disclose the terms of the Norgas benefit plan and the plaintiffs' benefit rights following the sale. Thus, it can hardly be disputed that, insofar as state law fraud principles are relevant here, they relate to the administration of an employee benefit plan governed by ERISA and are thus preempted.[18] *See Justice v. Bankers Trust,* 607 F.Supp. 527 (1985) (state law claims of fraud based upon suppression of material facts relating to employee benefit plan preempted by ERISA); *District 65, UAW v. Harper & Row Publishers, Inc.,* 576 F.Supp. at 1487 (state common law claims of fraud, conversion,

unjust enrichment, and tortious interference with contract preempted by ERISA); *Ogden v. Michigan Bell Telephone Co.,* 571 F.Supp. 520, 524 (E.D.Mich.1983) (state common law fraud claim dismissed as preempted by ERISA); *Whitaker v. Texaco, Inc.,* 566 F.Supp. 745 (N.D.Ga.1983) (state law misrepresentation and breach of fiduciary duty claims preempted by ERISA); *Ziskind v. Retail Clerks International Association,* 3 E.B.C. 1012, 1014–15 (E.D.Cal.1982) (state cause of action for negligent misrepresentation preempted by ERISA). *Cf. Russell v. Massachusetts Life Ins. Co.,* 722 F.2d 482 (9th Cir.1983), *cert. granted* — U.S. —, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984)[19] (state law tort claims for negligent and intentional infliction of emotional distress preempted by ERISA); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.1981), *cert. denied* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (state common law tortious interference with contract claim preempted by ERISA); *Kelly v. IBM,* 573 F.Supp. 366 (E.D. Pa.1983), *affirmed* 746 F.2d 1467 (3d Cir. 1984) (state law wrongful discharge claim preempted by ERISA); *UAW v. Dyneer Corp.,* 4 E.B.C. 1486, 1488 (N.D.Ohio 1983), *affirmed* 747 F.2d 335 (6th Cir.1984) (various state law claims, including tort claim for conversion, preempted by ERISA); *Shaw v. Association of Machinists & Aerospace Workers Pension Plan,* 563 F.Supp. 653 (C.D.Cal.1983) (state common law breach of contract claim preempted by ERISA). Indeed, in the present case, it is important to note that the plaintiffs' claims of misrepresentation and conspiracy to misrepresent deal with an area already specifically regulated by ERISA—namely, reporting and disclosure of plan terms, provision of information to participants, the content of plan descriptions, and so on. *See, e.g.,*

---

**18.** Indeed, the plaintiffs themselves implicitly recognize that these fraud claims "relate to" an employee benefit plan, since the only compensatory damages specifically sought by the plaintiffs for these fraud claims are "compensatory damages in the form of loss of employee benefits, including but not limited to, the value of the following benefits: early retirement, retirement, life and health insurance, vacation, and

savings plan benefits...." (Pretrial Order at 17).

**19.** The grant of certiorari in *Russell* is apparently limited to whether a fiduciary may be liable for "punitive damages or extracontractual compensatory damages" under ERISA. — U.S. —, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984).

29 U.S.C. §§ 1021 through 1030. To allow plaintiffs to pursue the present common law claims of misrepresentation would bring to pass the very result which Congress intended to prohibit—the possibility of inconsistent state law regulation of matters relating to the administration of employee benefit plans.

■ For these reasons, the Court finds that plaintiffs' state law claims of fraud and conspiracy to defraud relating to misrepresentation or nondisclosure of material facts about the crediting of Amoco service under Norgas ERISA plans are indeed preempted. Defendants are entitled to judgment as a matter of law with respect to these claims.[20]

## II. *The ERISA Claims*

Having thus disposed of the plaintiffs state law claims, we now come to the core of this lawsuit. Although the sale of Amoco's LPG facilities had all the earmarks of a routine business transaction, plaintiffs insist that insofar as their employee benefits were concerned, the terms of the sale and the manner in which it was accomplished violated several provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The primary theme of these ERISA claims is that Amoco and Norgas violated a supposed duty under ERISA to effect the LPG sale on terms that would ensure that years of service with Amoco would be credited in calculating benefits under Norgas benefit plans.

ERISA is a comprehensive and reticulated statute designed to prescribe minimum vesting and accrual standards for qualifying employee retirement benefit plans; to establish minimum rules for employee par-

ticipation and plan funding; to delineate fiduciary standards for plan managers; and to otherwise ensure that legitimate employee pension expectations are not defeated. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981). For purposes of the issues presented here, the pertinent portion of ERISA is Subchapter I of the Act, 29 U.S.C. §§ 1001–1144.

ERISA divides employee benefits covered by the Act into two categories: (1) pension benefits (referred to herein as "retirement" benefits); and (2) all other benefits (including, for example, medical and disability). 29 U.S.C. § 1002(1)–(2). The Act terms the second category "welfare" benefits. For both categories of benefits, retirement and welfare, ERISA imposes certain disclosure and reporting requirements (Subchapter I, Part 1, set forth at 29 U.S.C. §§ 1021–1031) and certain fiduciary obligations (Subchapter I, Part 4, set forth at 29 U.S.C. §§ 1101–1114). Perhaps most importantly, ERISA requires that employer plans providing both categories of benefits be established and maintained in writing, 29 U.S.C. § 1102(a), and that the rights conferred by the terms of such written plans are enforceable by the participants as a matter of federal law. 29 U.S.C. § 1132.

In addition, for certain but not all retirement benefits, ERISA imposes minimum requirements for the participation in and the vesting of benefits under retirement plans (Subchapter I, Part 2, set forth at 29 U.S.C. §§ 1051–1061) and for the funding of plans to ensure that assets are available to pay the retirement benefits when the time comes (Subchapter I, Part 3, set forth at 29 U.S.C. §§ 1081–1086). These partic-

---

**20.** Defendants also contend that these claims are barred by the statute of limitations and that plaintiffs suffered no damage as a proximate result of their reliance on any misrepresentations concerning the terms of the sale. These contentions have substantial support in the record. However, because the Court finds these fraud claims preempted, there is no need to reach these other contentions made by the defendants. The Court does note, however, that the record is entirely devoid of any evidence of

any agreement or conspiracy between Amoco and Norgas to commit a civil wrong. In the absence of such evidence, the conspiracy to defraud claim fails as a matter of law. *See Purcell Co., Inc. v. Spriggs Enterprises, Inc.*, 431 So.2d 515 (Ala.1983) (negotiation of business sale alone is insufficient to establish that parties agreed or conspired to perpetrate a tort). The Court specifically notes this as an alternative basis for the dismissal of the fraud claims predicated upon conspiracy.

ipation, vesting, and funding requirements are not applicable to welfare benefit plans. 29 U.S.C. §§ 1051, 1081(a)(1). The vesting requirements for retirement benefits apply to what the particular plan establishes as the "normal retirement benefit" that will be paid at the "normal retirement age." 29 U.S.C. § 1053(a). With whatever "normal retirement benefit" the particular plan establishes as the reference, ERISA sets minimum benefit "accrual" standards, which require that a pro-rata share of that normal retirement benefit be attributed to the employee as a function of his years of participation in the plan (which, for present purposes, may be considered to be his years of service with the employer). 29 U.S.C. § 1054. ERISA's minimum vesting standards require that after a number of years of service, an employee's "right" to whatever accrued benefit he has earned *to that time* cannot be forfeited even though his service with the employer terminates before he reaches what the particular plan defines as the "normal retirement age." 29 U.S.C. § 1053.

A retirement benefit that is vested may still be "contingent" in several important respects. 29 U.S.C. § 1053(a)(3)(A)–(D). In particular, a plan may permissibly provide that vested benefits are not payable until normal retirement age and, if the employee dies before that time, his benefit, while vested, generally need not be paid. *See, e.g., Hernandez v. Southern Nevada Culinary and Bartenders Pension Trust*, 662 F.2d 617, 619–620 (9th Cir.1981). On the other hand, welfare benefits and the so-called "ancillary" retirement benefits, including early retirement benefits such as plaintiffs complain of in this case, may be "contingent" in a much more pervasive sense—ERISA does not require that such benefits be vested and nonforfeitable. *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406 (4th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984); *Petrella v. NL Industries, Inc.*, 529 F.Supp. 1357, 1364–1366 (D.N.J.1982). Accordingly, an employee's "rights" to such benefits may be forfeited entirely if his service with the

employer is terminated before he becomes eligible under the plan's terms for payment of such benefits. *Petrella v. NL Industries, Inc.*, 529 F.Supp. at 1364–65.

It is equally important to note that ERISA does not require that employers provide employee benefits at all; does not confer a general right to continued employment in order to earn vested retirement benefits or to become eligible for other benefits; and does not mandate the level or amount of such benefits.

[A]n employer has no affirmative duty to provide employees with a pension plan. H.Rep. No. 93–807, 93rd Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. and Ad.News, 4670, 4677. In enacting ERISA, Congress continued its reliance on *voluntary* action by employers by granting substantial tax advantages for the creation of qualified retirement programs. *Id.* Neither Congress nor the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees; these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate, by federal legislation.

*Moore v. Reynolds Metals Co. Retirement Program*, 740 F.2d 454, 456 (6th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985) (emphasis in original). *Accord Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. at 511, 512–14, 101 S.Ct. at 1900, 1901.

A claim of wrongful denial or deprivation of employee benefits under ERISA involves a two-pronged inquiry: (1) is the action or conduct complained of contrary to the terms of the plan itself? (2) are the terms of the plan or the conduct complained of independently violative of ERISA's substantive requirements?

In this case, the answer to the first question is undisputed. The Standard Plan itself did not confer upon plaintiffs a right to

guaranteed or continued employment with Amoco in order to earn retirement benefits. Rather, the Plan expressly provided that:

> Nothing contained in this Plan shall be construed as a contract of employment between an employer and any employee, or as a right of any employee to be continued in the employment of an employer.

(Webb Affidavit, Ex. A at § 14.07, Appendix in Support of Amoco's Motion for Summary Judgment at A354). Nor did the terms of that plan require that Amoco arrange for plaintiffs' years of service with Amoco to be credited for all purposes under the retirement plan of any future purchaser of the LPG operation. Nor do plaintiffs contend that there was a forfeiture of any vested retirement benefit to which they were entitled under the Standard Plan. Rather, those plaintiffs who were vested under the Standard Plan at the time of the sale of the LPG operation to Norgas are receiving, at their option under that plan, an annuity based upon their length of service with Amoco. (Pretrial Order at 9).[21] Finally, plaintiffs have never even alleged that the terms of any other benefit plan available to employees of Amoco were violated by the Amoco-Norgas sale.

Accordingly, despite plaintiffs' generic allegations that the Amoco-Norgas transaction deprived them of "benefit rights," their claim that the Amoco-Norgas agreement could have been more generous in its benefit provisions, standing alone, has no force in law. Because nothing in the plans available to Amoco employees required otherwise, plaintiffs' complaints that their years of service with Amoco are not credited for all purposes under Norgas' retirement plan and their related complaints about the effect of the sale on their pension rights are legally immaterial unless ERISA forbids the arrangement agreed upon by Amoco and Norgas. Apart from the specific restrictions set forth in the statute, "ERISA permits the total benefit levels and formulas for determining their accrual before completion of 15 years of service to vary from plan to plan." *Alessi*, 451 U.S. at 513–14, 101 S.Ct. at 1901. Thus, because there is no allegation of breach of the terms of any plan available to them as Amoco employees (or for that matter, any Norgas plans), plaintiffs' claims fail as a matter of law *unless* the Amoco-Norgas sale violated one or more of ERISA's specific restrictions.

The plaintiffs claim that several of ERISA's specific substantive provisions have in fact been violated on the facts of this case:

(1) Plaintiffs allege that Amoco and Norgas violated or conspired to violate 29 U.S.C. § 1060(b)(2) by failing to credit plaintiffs' prior years of service with Amoco for purposes of benefit accrual under the Norgas retirement plan.

(2) Plaintiffs allege that Amoco and Norgas violated or conspired to violate 29 U.S.C. § 1056 by interfering with plaintiffs' possible future attainment of early retirement benefits under the Amoco plan.

(3) Plaintiffs allege that Amoco (acting in concert with Norgas) violated a fiduciary duty under 29 U.S.C. § 1104 to act solely on behalf of the plan participants in negotiating the terms of the sale insofar as those terms affected the plaintiffs' benefits under the Amoco plan.

(4) Plaintiffs allege that Amoco (acting in concert with Norgas) violated 29 U.S.C. § 1106 by engaging in a transaction involving the plan on behalf of parties whose interests were adverse to the interests of plan participants, and by dealing with the assets of the plan in their own interests.

---

**21.** As noted above, ERISA does not require a retirement plan to provide for such immediate payments of vested benefits. *See, e.g., Hernandez v. Southern Nevada Culinary and Bartenders Pension Trust,* 662 F.2d 617, 619–20 (9th Cir. 1981). Under the terms of the Standard Plan, however, a vested participant whose employment terminates before he is eligible for retirement may elect to receive at that time an annuity equivalent to the present actuarial value of the vested benefits. (*See* Webb Affidavit, Ex. A. at § 9.05(c) ). In this case, each of the 21 vested plaintiffs elected to receive an annuity immediately under this provision of the Standard Plan, and is currently receiving those payments. (See Pretrial Order at 9).

(5) Plaintiffs allege that Amoco and Norgas violated or conspired to violate 29 U.S.C. §§ 1140 and 1141 by interfering with rights or the attainment of rights to which plaintiffs might have become entitled under the Amoco plan.

(6) Plaintiffs allege that Amoco (but not Norgas) violated the reporting and disclosure requirements of 29 U.S.C. §§ 1022 and 1024 by failing to disclose the circumstances and modifications which might result in disqualification, ineligibility, denial or loss of benefits under the Amoco plan.

In short, the plaintiffs have invoked every section of ERISA which is even colorably applicable to the facts of this case. As will be seen, however, these ERISA violations are more easily pleaded than proved. Although ERISA's substantive provisions have been systematically invoked and clothed in verbiage and allegations which carefully track the text of the Act, in each instance the plaintiffs proceed from faulty premises and inadequate foundations of fact. Consequently, each of their claims under ERISA fails as a matter of law.[22] We will proceed to address each claim separately.

A. *The Claims Under 29 U.S.C. § 1060*

■■■ The plaintiffs insist that by failing to credit their prior years of service with Amoco in calculating the accrual of benefits under the Norgas plan, Amoco and Norgas violated 29 U.S.C. § 1060. That section provides in pertinent part:

(b) For purposes of this part and part 3—

(1) in any case in which the employer maintains a plan of a predecessor employer, service for such predecessor shall be treated as service for the employer, and

(2) in any case in which the employer maintains a plan which is not the plan maintained by a predecessor employer, service for such predecessor shall, to the extent provided in regulations prescribed by the Secretary of the Treasury, be treated as service for the employer.

29 U.S.C. § 1060(b).

This provision forms the crux of this entire controversy, for the heart of the plaintiffs' case is and always has been their claim that they should receive credit for their years of service with Amoco for purposes of computing benefits under the Norgas retirement plan.[23] Plaintiffs allege that defendants violated this provision of ERISA by

fail[ing] to maintain the predecessor plan so that years of service would be treated as years with Norgas or in the alternative to maintain a separate plan from the predecessor plan but to have years of service in the predecessor corporation (Amoco) treated as years of service for the employer (Norgas) ([29 U.S.C. § ] 1060).

(Pretrial Order at 14).

The allegation "in the alternative" notwithstanding, subsection (b)(1) is irrelevant to this case. It is undisputed that Norgas and its employees were part of a pre-existing plan. Apart from the fact that about 400 people (out of a total of approximately

---

**22.** In addition to the substantive ERISA violations enumerated above, plaintiffs have alleged a separate claim for a general conspiracy to violate ERISA. (Pretrial Order at 13). It would appear that this general "conspiracy to violate ERISA" claim fails to state a claim under ERISA, the provisions of which focus on the underlying wrong rather than any conspiracy to commit the wrong. In any event, considering all evidence and inferences reasonably drawn therefrom, the Court finds no evidence in this record tending to establish that Amoco and Norgas agreed to violate ERISA. *See and compare* note 19, *supra.* Moreover, since the Court finds no substantive violations of ERISA on the facts

of this case, the general "conspiracy to violate ERISA" claim must likewise fail.

**23.** As set forth in the Amoco-Norgas sale agreement, service with Amoco *is* credited for purposes of *vesting* under the Norgas retirement plan. (Prertial Order at 7). Amoco service is credited under the other Norgas plans, as well. (Ex. A to Aff. of John Churchill). Although their damage allegations are somewhat ambiguous on this point (Pretrial Order at 17–18), plaintiffs have not adduced evidence of any loss caused by the alleged ERISA violations apart from the failure to credit Amoco service in calculating Norgas retirement benefits.

56,000) left the Standard Plan due to the Norgas sale, the sale had no effect on the Standard Plan. Nothing in the words of § 1060(b)(1) requires that the plan of a predecessor employer *actually be maintained* by a successor employer, either "in the alternative" to the requirements of subsection (b)(2) or otherwise. Rather, the plain words of subsection (b)(1) provide only that service with a predecessor employer "shall be treated as service" with a successor employer *if* the successor elects to maintain the plan of the predecessor. Moreover, that plain meaning is confirmed by the legislative history. *See* House Conference Rep. No. 93–1280, *reprinted in* 1974 *U.S.Code Cong. & Ad.News* 4639, 5038, 5047 ("[s]ervice with a predecessor employer must be counted for purposes of the plan if the successor employer continues to maintain the plan of the predecessor employer....") (emphasis supplied). Where, as here, a predecessor plan is not maintained by a successor employer, § 1060(b)(1) is simply inapplicable.[24]

Nor is Section 1060(b)(2) the oasis that plaintiffs would like it to be. The language of subsection (b)(2) requires a successor employer to credit an employee's years of service with a predecessor employer for purposes of determining that employee's retirement benefits only if and to the extent the Secretary of Treasury issues regulations requiring such service to be credited. Since the Secretary of Treasury has never required, by regulation or otherwise, that such service be credited, it is clear from the statutory language that, for now at least, such service need not be credited by a successor employer. Whether the failure to promulgate regulations requiring successor employers to credit service with a predecessor employer has been a conscious policy decision on the part of the Secretary or not, the plain import of § 1060(b)(2) is that Congress chose to vest the Secretary with the discretionary authority to decide if and to what extent such service should be credited. Unless and until the Secretary requires otherwise, Congress obviously chose as a matter of policy not to require prior service with a predecessor employer to be taken into account in calculating benefits under the successor employer's separate retirement plan.

Plaintiffs' claim under § 1060(b)(2) in essence asks this Court to construe § 1060(b)(2) as if it read: "service for such predecessor *shall* be treated as service for the employer *except* as regulations prescribed by the Secretary of the Treasury otherwise allow." While Congress could easily have drafted the subsection that way, it chose not to do so. Rather, it provided that service with a predecessor shall be treated as service with a successor only "to the extent provided" by any affirmative regulations the Secretary of Treasury might choose to promulgate. This Court is bound by the Congressional directive embodied in the clear language of the statute, absent a clearly expressed legislative intention to the contrary. *See Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983); *American Bank & Trust Co. v. Dallas County,* 463 U.S. 855, 861, 103 S.Ct. 3369, 3373, 77 L.Ed.2d 1072, 1078 (1983); *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *United States v. 640.00 Acres of Land in Dade County, Florida,* 756 F.2d 842 (11th Cir. 1985); *Scarborough v. OPM,* 723 F.2d 801, 812 (11th Cir.1984).

There is nothing in ERISA's legislative history to cast doubt upon the plain meaning of the statute, much less anything amounting to "a clearly expressed legislative intention to the contrary." *American Bank & Trust Co. v. Dallas County,* 463

---

**24.** A contrary construction would not only flout 1060(b)(1)'s express language and the legislative history, but would also contravene the rule that, under ERISA, "[n]either Congress nor the Courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide." *Moore v. Reynolds Metals Co. Retirement Program,* 740 F.2d 454, 456 (6th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

U.S. at 861, 103 S.Ct. at 3373, 77 L.Ed.2d at 1078. The House Conference Report declares quite simply that except where the successor employer maintains the plan of a predecessor employer, the question of whether service with the predecessor is to be credited is left entirely to the determination of the Secretary of Treasury:

Service with a predecessor employer must be counted for purposes of the plan if the successor employer continues to maintain the plan of the predecessor employer.... The question of the extent to which such service must be counted in other circumstances is to be determined under regulations.

House Conference Report No. 93–1280, *reprinted in* 1974 *U.S.Code Cong. & Adm. News* at 5038, 5047, 5052. Other portions of the legislative history make it even clearer that § 1060(b), standing alone, does not require the crediting of prior service with a predecessor employer:

[W]here the employee moves from one employer to another, the ancillary benefits (which are usually on a contingency basis) would often be provided by the new employer, whereas the new employer would not provide pension benefits based on years with the old employer.

House Report No. 93–807, *reprinted in* 1974 *U.S.Code Cong. & Adm.News* 4670, 4726.

Apparently, only one court has addressed the issue of a successor employer's obligation to credit prior years of service with a predecessor employer for retirement benefit purposes. In *Vorpahl v. Union Oil Co. Retirement Plan,* 4 E.B.C. 2565 (D.Minn.1983), *affirmed* 749 F.2d 1266 (8th Cir.1984), the court analyzed the issue and concluded that a successor employer is not required to credit an employee's years of service with a predecessor employer for purposes of determining that employee's benefits under the successor employer's pension plan. However, rather than focusing its inquiry on Section 1060(b)(2), the *Vorpahl* court looked to Department of Labor regulations defining "year of ser-

vice." This regulation states in pertinent part:

§ 2530.240–1. *Year of Participation for Benefit Accrual*

\* \* \* \* \* \*

(b) *Service Which May be Disregarded For Purposes of Benefit Accrual.* (1) In calculating an employee's period of service for purposes of benefit accrual under a defined benefit pension plan, § 204(b)(3) [29 U.S.C. § 1054(b)(3)] of the Act and § 411(b)(3) of the [Internal Revenue] Code permit the following service to be disregarded: service before an employee first becomes a participant in the plan; ....

29 C.F.R. § 2530.204–1(b) (1976). Thus, not only has the Secretary of Treasury chosen not to issue regulations requiring an employee's service with a predecessor employer to be credited in calculating retirement benefits under the successor's own plan, but the Department of Labor regulation defining "year of service" expressly permits an employer to disregard an employee's service before he becomes a participant in its pension plan. *See Vorpahl,* 4 EBC at 2575. Therefore, since plaintiffs were not participants in the Norgas retirement plan during their prior years with Amoco, Norgas is under no statutory obligation to credit their years of service with Amoco for purposes of calculating their Norgas retirement benefits.

Finally, in response to plaintiffs' apparent argument that this Court should fashion such a requirement, it is important to note the very real dangers involved in such an endeavor. In the first place, judicial exercise of the authority delegated to the Secretary of Treasury would contravene the language of the statute and the principles of statutory construction discussed above, as well as the clearly expressed legislative intent of Congress that the "question of the extent to which such service must be counted ... is to be determined under regulations." House Conference Report No. 93–1280, 1974 *U.S.Code Cong. & Adm.News* 5038, 5047, 5052. Fur-

thermore, settled legal principles dictate that courts may not exercise the authority to promulgate legislative rules that a statute delegates to an administrative agency or other rulemaking body. *See, e.g., Sierra Club v. Indiana-Kentucky Electric Corp.*, 716 F.2d 1145, 1154 (7th Cir.1983). *See also Citizens for Clean Air, Inc. v. Corps of Engineers, U.S. Army*, 356 F.Supp. 14, 18 (S.D.N.Y.1973) ("where Congressional action has provided an administrative process for the resolution of particular subjects, great respect must be paid to the presumptive exclusivity of that process").

From a more practical viewpoint, the creation of crediting requirements by a court under § 1060(b)(2) would involve numerous questions of policy, the resolution of which would have consequences far beyond the case at hand. Requiring a successor employer to credit an employee's years of service with a predecessor employer could frustrate the very purpose of ERISA. In large part, ERISA was enacted to protect and secure the viability and desirability of employer-established retirement programs for employees. H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S. Code Cong. & Adm.News* 4639; S.Rep. No. 383, 93d Cong. 2d Sess, *reprinted in* 1974 *U.S.Code Cong. & Adm.News* 4890. However, requiring a successor employer to credit an employee's years of service with a predecessor employer for retirement purposes would dramatically increase an employer's cost of operating a retirement ben-

efit plan for its employees, since the successor would be required to immediately fund a retirement plan much more heavily whenever it adds employees previously covered under a predecessor employer's plan. Faced with this dilemma, many employers might choose not to establish or continue a retirement plan rather than incur the significant cost of funding an employee's years of service with a predecessor employer. Alternatively, the employer may simply choose not to hire the employees of the predecessor.[25] In either event, the employees in question would be adversely affected—*i.e.*, they would either lose their retirement plan or lose their jobs. Surely Congress could not have intended such a severe result. Thus, it may not be altogether surprising that the Secretary of Treasury has chosen not to issue regulations imposing such a crediting requirement.[26] This Court is hardly competent to second-guess such decisions of Congress and its delegates on difficult questions of legislative policy. The function of this Court is to apply the statutes, not to rewrite them.

■ In short, unless and until the Secretary of Treasury prescribes otherwise, Section 1060(b)(2) does not require a successor employer to credit an employee's service with a predecessor employer [27] in calculating the employee's retirement benefits under the successor's separate retirement plan. Accordingly, the defendants are entitled to judgment as a matter of law with respect to the Section 1060(b) claims.[28]

---

**25.** Plaintiffs do not (and cannot) contend that the termination of all employees of a particular business or division in connection with the sale of that operation would constitute a *per se* violation of any provision of ERISA. *Cf. Sutton v. Weirton Steel,* 567 F.Supp. 1184 (N.D.W.Va. 1983), *affirmed* 724 F.2d 406 (4th Cir.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

**26.** If and when the Secretary of Treasury does promulgate regulations imposing a crediting requirement, the validity of those regulations will of course be determined under settled principles of administrative law. *Cf. Rowan Companies Inc. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (court's in-

quiry generally limited to whether the regulation is within the delegation of authority).

**27.** For present purposes, the Court has assumed without deciding that this is the type of "predecessor employer" situation that would fall within the ambit of § 1060(b).

**28.** In analogous situations where a federal statute delegates authority to promulgate regulations to an administrative agency and does no more than adopt these regulations by advance reference, the federal courts have consistently held that where the administrative agency fails or chooses not to promulgate the described regulations, there is no substantive law for the court to apply and the court therefore lacks jurisdiction to entertain a claim alleging a viola-

B. *The Claims Under 29 U.S.C. § 1056*

Plaintiffs next contend that by entering into the Amoco-Norgas sale defendants violated 29 U.S.C. § 1056, inasmuch as they interfered "with the rights of the plaintiffs in the attainment of service requirements necessary to obtain early retirement benefits." (Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment at 37). This claim is specious. This section of ERISA is quite limited in scope and effect. It provides in pertinent part:

> ... Each pension plan shall provide that unless the participant otherwise elects, the payment of benefits under the plan to the participant shall begin not later than the 60th day after the latest of the close of the plan year in which—
>> (1) the date on which the participant attains the earlier of age 65 or the normal retirement age specified under the plan,
>> (2) occurs the 10th anniversary of the year in which the participant commenced participation in the plan, or
>> (3) the participant terminates his service with the employer.
>
> In the case of a plan which provides for the payment of an early retirement benefit, such plan shall provide that a participant who satisfied the service requirements for such early retirement benefit, but separated from the service (with any nonforfeitable right to an accrued benefit) before satisfying the age requirement for such early retirement benefit, is entitled upon satisfaction of such age requirement to receive a benefit not less than the benefit to which he would be entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury.

29 U.S.C. § 1056(a). In short, § 1056 merely requires that *if* a plan provides early retirement benefits, an employee who has satisfied plan requirements as to years of service shall be entitled to receive an actuarially reduced benefit upon reaching the early retirement age specified in the plan, even if that employee leaves the employer's service prior to attaining early retirement age. It is important to recognize that neither ERISA in general nor § 1056 in particular require a plan to provide early retirement benefits at all. Moreover, even if an employer does provide early retirement benefits, § 1056 itself does not confer upon plan participants any substantive right to continued employment in order to meet service requirements and qualify for early retirement benefits under the terms of the particular plan.

In the present case, it is undisputed that the terms of the Amoco plan go well beyond the minimum requirements of § 1056 by giving terminated employees the option to receive actuarially reduced benefits *immediately* upon their termination rather than requiring that the terminated employees attain the early retirement age specified in the plan before receiving vested early retirement benefits. It is also undisputed that all plaintiffs who were vested under the Amoco plan elected that option and are currently receiving such payments. (*See* Pretrial Order at 9). With this in mind, it is plain that the claim of a violation of § 1056 has no support whatsoever on this record. The plaintiffs are apparently laboring under the misapprehension that ERISA in general and § 1056 in particular provide comprehensive protection of the inchoate interests of employees in such unfunded, contingent benefits. Such is not the case. *Cf. Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406 (4th Cir.1983), *cert. denied* — U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

Because Section 1056 confers no substantive right to continued employment in order to earn vested rights to early retirement benefits, the defendants are entitled to

---

tion of the Act. *See, e.g. Plan for Arcadia, Inc. v. Anita Associates,* 501 F.2d 390, 392 (9th Cir. 1974), *cert. denied* 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974); *Wuillamy v. Werblin,* 364 F.Supp. 237, 240 n. 2 (D.N.J.1973). *Cf. Sierra Club v. Indiana-Kentucky Electric Corp.,* 716 F.2d at 1154; *Citizens for Clean Air, Inc. v. Corps of Engineers, U.S. Army,* 356 F.Supp. at 18.

judgment on the Section 1056 claims as a matter of law.[29]

## C. *The Claims Under 29 U.S.C. § 1104*

■ Plaintiffs next contend that Amoco and Norgas violated their fiduciary duties under 29 U.S.C. § 1104. That provision of ERISA provides in pertinent part:

> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan ...

29 U.S.C. § 1104(a)(1). Plaintiffs base their claims of a violation of this section upon the following allegations:

> Amoco dealt with the plan and the assets of the plan in its own interests and not in the interests of the plan participants in that it received more money for the facilities by not transferring years of service and/or the accumulated benefits of the participants in the plan to Norgas and further were allowed to keep and maintain the additional sums of money in the plan for the use of other participants, including itself, to the damage of plaintiffs.

(Pretrial Order at 16). In other words, plaintiffs' theory with respect to their § 1104 claims is quite similar to the substance of their § 1060 claims: they claim that in negotiating the terms of the sale of its LPG operation, Amoco was under a fiduciary duty to ensure that plaintiffs' years of service with Amoco would be credited for all purposes under the Norgas retirement plan, and that Amoco's failure to

arrange a sale transaction meeting these standards violates the statute. Furthermore, although plaintiffs admit that Norgas was not a fiduciary with respect to the Amoco plan and hence owed no direct fiduciary duties to plaintiffs as beneficiaries of that plan,[29.5] they contend that Norgas is liable for assisting Amoco in the commission of a breach of Amoco's fiduciary duties. *Cf. Donovan v. Daugherty*, 550 F.Supp. 390, 411 (S.D.Ala.1982) (holding that nonfiduciaries may be accountable under ERISA for breaches of fiduciary duty which they help promote).[30]

Plaintiffs' claim under § 1104 is without merit. The fiduciary duty provisions of ERISA are not implicated in the sale of a business or a portion of a business merely because the terms of the sale will affect the terms and conditions of contingent future retirement benefits.

This is lucidly illustrated by the related cases of *Sutton v. Weirton Steel Division of National Steel Corp.*, 567 F.Supp. 1184 (N.D.W.Va.1983), and *Dhayer v. Weirton Steel Division of National Steel Corp.*, 571 F.Supp. 316 (N.D.W.Va.1983), both of which were affirmed in *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406 (4th Cir.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). In *Sutton* and *Dhayer*, plaintiffs included both union and non-union employees of National Steel's Weirton Steel Division. There, as here, the plaintiffs challenged the sale of a division of their employer's business and the terms of the underlying transaction on the grounds that, as a result of the sale, their non-vested retirement and early retirement benefits and other contingent benefits would be adversely affected. Specifically, the terms of the sale provided that the seller's existing

---

**29.** In any event, the plaintiffs have not stated a proper claim against Norgas under § 1056. Norgas clearly was not the employer, administrator or fiduciary responsible for complying with the requirements of § 1056 vis-a-vis the Amoco plan, and no evidence has been adduced to demonstrate that Norgas promoted or participated in any such violation by Amoco within the meaning of *Donovan v. Daugherty*, 550 F.Supp. 390, 411 (S.D.Ala.1982).

**29.5** *See* Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment at 41.

**30.** For present purposes, it is not necessary for this Court to adopt the theory of *Donovan* nor express a view as to its scope or validity.

benefit plan would be amended so that the sale itself would not trigger entitlements to different types of early retirement and severance pay benefits. *See Sutton*, 724 F.2d at 409. As in the present case, the plaintiffs were to become employees of the successor employer, and their eligibility for early retirement benefits was to be more limited than under the predecessor employer's plan. *Sutton*, 567 F.Supp. at 1190; *Dhayer*, 571 F.Supp. at 321. There, as here, the employees alleged that avoidance of pension and welfare benefit obligations was the employer's motive in agreeing to the sale and its terms. *Sutton*, 567 F.Supp. at 1198; *Dhayer*, 571 F.Supp. at 326.

Because the cases were being decided on summary judgment, the district court specifically assumed as true "that avoiding future pension obligations was the sole motivation of [the employer-seller]." *Sutton*, 567 F.Supp. at 1198; *Dhayer*, 571 F.Supp. at 326. Nevertheless, the court squarely rejected the plaintiffs' claim that, under § 1104, National Steel had a fiduciary obligation to act solely in the interest of beneficiaries in negotiating the terms of the sale. In so holding, the court noted that ERISA simply does not prohibit a company from eliminating previously offered benefits which are neither vested nor accrued. *Sutton*, 567 F.Supp. at 1196, 1200; *Dhayer*, 571 F.Supp. at 324, 328–29. *Accord Petrella .v. N.L. Industries*, 529 F.Supp. 1357, 1365–66 (D.N.J.1982). Likewise, the court held, there is no requirement that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants:

> When acting on behalf of the pension fund, there is no doubt that [an employer who is also a fiduciary with respect to a plan] must act solely to benefit participants and beneficiaries. However, it is the Court's opinion here that when a corporate employer negotiates the terms of the sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of future benefits (at least those that are not protected by ERISA's vesting and nonforfeitability provisions), do not implicate fiduciary duties as to the pension fund. Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund. In other words, the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior in negotiations concerning pension benefits not otherwise affected by the requirements of ERISA. *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 333 n. 16 [101 S.Ct. 2789, 2796 n. 16, 69 L.Ed.2d 672] ... (1981).

*Sutton*, 567 F.Supp. at 1200–01; *Dhayer*, 571 F.Supp. at 328–29. Accordingly, the district court granted summary judgment in favor of the employer-seller.

On appeal, the Fourth Circuit affirmed. After noting the district court's assumption that National Steel's sole motivation for the sale was avoiding future pension obligations, the appellate court held first that ERISA does not require the vesting and nonforfeitability of early retirement and other ancillary benefits. The court further held that ERISA does not impose any fiduciary obligations on an employer to maintain and protect future contingent benefit rights in negotiating the sale of a division:

> Congress ... has not prohibited an employer who is also a fiduciary from exercising the right accorded other employers to renegotiate or amend, as the case may be, unfunded contingent benefits payable before the normal retirement age. The changes, accomplished in this manner, are not to be reviewed by fiduciary standards.

724 F.2d at 410–11.

Considering the *Weirton Steel* decisions in the context of the present case, it is clear that plaintiffs' claims under 29 U.S.C. § 1104 are without merit. As noted in the previous discussion of 29 U.S.C. § 1060, *infra*, ERISA presently imposes no re-

quirement that service with a predecessor employer be credited in calculating benefits under the successor-employer's plan. Thus, neither Norgas nor Amoco violated ERISA in their capacity as employers by failing to include such a provision in the sale agreement. Moreover, despite the fact that the sale obviously had certain effects upon plaintiffs' benefits under the Amoco plan, clearly neither Amoco nor Norgas had any fiduciary duty under ERISA to act solely in the plaintiffs' interests in negotiating the terms upon which the LPG operations were to be sold. A contrary holding would mean that every corporate business decision which had any possible collateral effect on pension benefits would have to be made "solely in the interests of pension plan beneficiaries and participants." *Cf. Sutton,* 567 F.Supp. at 1200; *Dhayer,* 571 F.Supp. at 328. At least insofar as contingent future benefit rights are concerned, Congress clearly could not have intended such a pernicious result.

■ The Court finds the *Weirton Steel* cases persuasive and controlling, and agrees that "when a corporate employer negotiates the sale of a division, whose employees are participants in a pension plan, the negotiations that affect the terms and conditions of [non-vested] future pension benefits ... do not implicate fiduciary duties as to the pension fund." *Sutton,* 567 F.Supp. at 1201; *Dhayer,* 571 F.Supp. at 328. Plaintiffs have cited no contrary authority even arguably on point.

If Congress explicitly considered the question of whether successor employers must credit service with a predecessor employer, and left the question to be determined under Treasury Regulations, it would seem clear that Congress could not have intended § 1104 to implicitly require such crediting in any event. The plaintiff's

theory under § 1104 would seem to render § 1060(b) essentially redundant, even under their own reading of the latter provision. Based upon the foregoing discussion, then, the Court finds that defendants [31] are entitled to judgment as a matter of law with respect to the claims made under 29 U.S.C. § 1104.

**D.** *The Claims Under 29 U.S.C. § 1106*

■ Plaintiffs next allege that Amoco and Norgas violated 29 U.S.C. § 1106, which provides, *inter alia:*

(a) ...

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

.    .    .    .    .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan;

.    .    .    .    .

(b) A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection

---

**31.** Clearly, if Amoco breached no fiduciary duties in negotiating the sale of the LPG facilities, then Norgas, which was not a fiduciary with respect to the Amoco plan, cannot be held liable for promoting or participating in any such breach. *Compare Donovan v. Daugherty,* 550 F.Supp. 390, 411 (S.D.Ala.1982). In any

event, the Court is of the opinion that the mere purchase of a going business from a fiduciary, without more, would not render a nonfiduciary liable under § 1104 for the seller's breaches of fiduciary duty in connection with the sale, at least where no transfer of plan assets is involved.

with a transaction involving the assets of the plan.

.    .    .    .    .

29 U.S.C. § 1106.

Plaintiffs contend that Amoco was a fiduciary with respect to the Amoco Plan and that by selling the LPG operations without ensuring that service with Amoco would be credited for all purposes under the Norgas retirement plans, Amoco acted in a "transaction involving the plan" on behalf of parties whose interests were adverse to the interests of plan participants and beneficiaries; dealt with the assets of the plan in its own interests; and caused the plan to engage in a transaction which indirectly transferred "a benefit" to a party-in-interest—namely Amoco. This, say the plaintiffs, constitutes a prohibited transaction under § 1106.[32]

Although the plaintiffs have attempted to couch their allegations in the language of the statute itself, it is plain that § 1106 is inapplicable to the transaction at hand. On its face § 1106 applies only to transactions to which the plan itself is a party or in which the monies, property or fiscal assets of the plan are involved, and it has been construed accordingly. *Sutton v. Weirton Steel Division of National Steel Corp.*, 567 F.Supp. 1184, 1199 (N.D.W.Va. 1983); *Dhayer v. Weirton Steel Division of National Steel Corp.*, 571 F.Supp. 316, 327 (N.D.W.Va.1983) [both affirmed in *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406 (4th Cir.1983), *cert. denied,* —— U.S. —— 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) ]. *Accord, Donovan v. Bierwirth,* 680 F.2d 263, 270 (2d Cir. 1980), *cert. denied* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Congress did not intend an expansive interpretation of Section 1106. *Evans v. Bexley,* 750 F.2d 1498, 1500 n. 3 (11th Cir.1985).

In the present case, the evidence stands uncontroverted that the Standard Plan was not a party to the Amoco-Norgas transaction. (*See* Affidavit of William C. Jackson). Nor did the LPG facilities involve any transfer of the funds or assets held by the Standard Plan. (*Id.*).

■■■■■ Plaintiffs' only effort to establish evidentiary support for their § 1106 claim is their contention that "Amoco did receive more money for the [LPG] facilities by not transferring the years of service or accumulated benefits of the participants in the plan to Norgas." (Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment at 41; *see also* Pretrial Order at 15–16). However, the evidence is undisputed that no funds or property held by the plan were transferred, and plaintiffs were not deprived of any benefit required to be vested and nonforfeitable by ERISA. Indeed, plaintiffs admittedly received all benefits to which they had already become entitled under the terms of the Standard Plan by the time of the sale and their consequent termination of employment with Amoco. As a matter of law, Amoco's contingent future liability for nonvested benefits—*i.e.,* plaintiffs' inchoate interest in their "years of service" with Amoco for purposes of the putative benefits to which they *might* have become entitled had they continued to work for Amoco—did not itself constitute an "asset" of the plan for purposes of § 1106, so as to prohibit Amoco from dealing with those contingent liabilities in its own interest or in ways adverse to the interests of plan participants and beneficiaries. *See Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d at 411–12. As noted above, the mere fact that an employer also acts as a plan fiduciary [33] does not restrict it from

---

**32.** Plaintiffs admit that Norgas was not a fiduciary with respect to the Amoco plan and that § 1106 is by its literal terms technically inapplicable to Norgas. *See* Brief of Plaintiffs in Opposition to Defendants' Motions for Summary Judgment at 41. However, plaintiffs contend that Norgas is liable for Amoco's violation of § 1106 because Norgas "participated" in the vio-

lation by Amoco. *Cf. Donovan v. Daugherty,* 550 F.Supp. 390 (S.D.Ala.1982) (third party who assists fiduciary in the breach of a fiduciary duty is liable for losses sustained by beneficiaries due to the breach). As to this contention, *see* notes 30 and 31, *supra.*

**33.** Amoco's parent, Standard Oil Company, is the administrator and named fiduciary of the

pursuing reasonable business behavior in negotiating the sale of a division, even though the terms ultimately agreed upon modify or eliminate the contingent rights of transferred employees to benefits under the seller's ERISA plan which are neither vested nor accrued. *Sutton,* 567 F.Supp. at 1200–01; *Dhayer* 571 F.Supp. at 328–29. *See also Sutton,* 724 F.2d at 411.

Because there is no evidence that the Standard Plan was a party to the Amoco-Norgas sale or that fiscal assets of the Standard Plan were involved in the transaction, there exists no genuine issue of material fact as to plaintiffs' claims under 29 U.S.C. § 1106. Therefore, as to these matters, defendants are entitled to judgment as a matter of law.

E. *The Claim Under 29 U.S.C. § 1140*

■ The next arrow in the plaintiffs' crowded quiver is 29 U.S.C. § 1140:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this title ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or this title] ...

The plaintiffs contend that by agreeing to the sale of the LPG operation on terms that did not assure the crediting of service with Amoco for all purposes under the Norgas retirement plan, Amoco and Norgas unlawfully "discriminated against the plaintiffs for the purpose of ·interfering with the attainment of the rights to which the plaintiffs might [have] become entitled under the [Amoco] Plan." (Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment at 25–26).

■ The plaintiffs misapprehend the purpose of Section 1140. That provision is not intended to prohibit the sale of going businesses or to require a successor employer to credit service with a predecessor employer—indeed, any such construction would render 29 U.S.C. § 1060 rather meaningless. Nor is Section 1140 intended to impose a fiduciary duty on employers to act solely in the interests of plan participants and beneficiaries in negotiating the terms of a sale of a business or division. Such matters are the province of Sections 1104 and 1106, which, as discussed above, do not impose such a duty. *See Sutton v. Weirton Steel Division,* 724 F.2d 406, 410 (4th Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). Rather, Section 1140 is intended simply to prohibit discriminatory harassment or adverse treatment of a particular employee which amounts to or threatens "constructive discharge," and which is carried out for the purpose of interfering with the employee's attainment of future benefits or punishing the employee for the exercise of protected rights. *West v. Butler,* 621 F.2d 240 (6th Cir.1980). This meaning is confirmed by the legislative history of the provision:

Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor-Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting. The managers of the bill ought to think twice too. *Discipline and discrimination can be so unpleasant as to amount to constructive discharge, a term used by the National Labor Relations Board. That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person*

"Amoco" plan. (*See* Pretrial Order at 9, pgh. 21). However, at least for purposes of the present motion, Amoco has not denied that it is a fiduciary with respect to the plan. *See generally* 29 U.S.C. § 1002(21).

*wishes he did not have to hang on and endure.*

*In recognition of that problem, section 610 of S.4 as originally reported— made it illegal to "discharge, fine, suspend, expell [sic], discipline or discriminate" against plan participants to defeat rights under the act or a plan.* The language parallels section 8(a)(3) of the National Labor Relations Act and should do the trick—but only if an adequate enforcement machinery exists.

119 Cong.Rec. 30374 (views of Senator Hartke, speaking on behalf of his proposal that the Secretary of Labor be directed to establish administrative procedures for enforcing the provision that became § 1140) (emphasis supplied). *See also West v. Butler,* 621 F.2d at 245; *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 916–17 (2d Cir.1982), *cert. denied* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982) ("this section is designed to prevent unscrupulous employers from discharging or harassing plan participants in order to keep them from realizing their vested pension rights").

The undisputed facts of this case establish that there was no harassment or discriminatory treatment of the plaintiffs amounting to the kind of "constructive discharge" or "discrimination" prohibited by 29 U.S.C. § 1140. Indeed, the only evidence of "discrimination" relied upon by the plaintiff in this connection is the mere fact that as a consequence of the sale, they were "prevented from attaining [the benefit] rights toward which they had been working as employees of Amoco." (Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment at 28). However, that consequence is part of nearly every sale or termination of a going business or division. ERISA simply does not require that every purchaser of a going concern credit service with a predecessor employer for purposes of the successor's separate plan, nor does it require that a successor's plan be identical in every respect to the predecessor's. Certainly Section 1140 contains no such requirement, express or implied. Here, as in *Aronson v.*

*Servus Rubber Division of Chromalloy,* 730 F.2d 12 (1st Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984), the plaintiffs' claim is grounded upon

a misreading of a section which relates to discriminatory conduct directed against individuals, not to actions involving the plan in general. The problem is with the word "discriminate." An overly literal interpretation of this section would make illegal any partial termination, since such terminations obviously interfere with the attainment of benefits by the terminated group, and, indeed, are expressly intended so to interfere. Such cannot be the intent of the section, where the statute expressly recognizes partial terminations. *See* 29 U.S.C. § 1343(b)(4) (incorporating Tax Code definitions, 26 U.S.C. § 411(d)(3) ). This is not to say that a plan could not be discriminatorily modified, intentionally benefiting, or injuring, certain identified employees or a certain group of employees, but a partial termination cannot constitute discrimination per se. A termination that cuts along independently established lines— here separate divisions—and that has a readily apparent business justification, demonstrates no invidious intent.... Nor can plaintiffs claim they were discriminated against with respect to participants in defendants' [other] operations that [were] not being [sold].... We cannot regard it as discriminatory for defendant to make voluntary contributions to continuing employees to maintain their morale, but not to make such to departing employees of the admittedly profitless, wound-up branch of its business.

*Aronson,* 730 F.2d at 16.

In the present case, the uncontroverted evidence adduced by the defendants establishes that the sale was motivated by legitimate business concerns. The evidence on this point reveals that, prior to the sale, Amoco conducted profitability studies of the LPG operation. This study revealed that the LPG operation was not sufficiently profitable, and would be even less profita-

ble in the future. This was primarily because, as a major refiner, Amoco was subject to Department of Energy regulations that limited the price it could charge for liquid propane. (Exhibits 265–289, Appendix in Support of Amoco's Motion for Summary Judgment at A169–A183). The price limitations did not apply to non-refiners, and for that reason, the LPG operation would be more valuable and profitable if owned by a non-refiner. (Exhibit 834, Appendix in Support of Amoco's Motion for Summary Judgment at A198). The approval of the sale by Amoco's parent, Standard Oil Company (Indiana), was based upon these facts. (Exhibit 265, Appendix at A169; Exhibit 267, Appendix at A171).

The plaintiffs do not attempt to controvert these facts. Indeed, the plaintiffs have stipulated that Amoco sought to sell the LPG operation for business reasons. (Pretrial Order at 5). However, the plaintiffs contend that because Amoco received offers from other prospective purchasers which were *lower than the Norgas offer* but included an offer to credit years of service with Amoco for all purposes under the buyers' retirement plans, Amoco must have accepted the Norgas offer "for the purpose of interfering" with the plaintiffs' attainment of future benefit rights in violation of Section 1140. Moreover, say the plaintiffs, since Norgas was a party to this "discrimination," Norgas is also liable.

The plaintiffs' theory distorts the plain meaning of Section 1140. Indeed, if the plaintiffs' theory were accepted, Section 1060(b) would be little more than a redundant appendage in the text of ERISA, since Section 1140 would generally have the effect of requiring employers to sell their businesses on terms that protect employees' inchoate interests in non-vested bene-

fits under the seller's plan. Neither the express language of Section 1140 nor its legislative history reveals any such Congressional intent.[34] The plain fact is that neither ERISA in general nor Section 1140 in particular was intended to outlaw the termination of contingent future liabilities such as those involved here pursuant to the sale of the entire division or operation of the employer's business. *See Aronson,* 730 F.2d at 16. *Cf. Sutton v. Weirton Steel Division,* 567 F.Supp. 1184, 1198 (N.D.W.Va.1983) (even assuming that avoiding future pension obligations was the employer's *sole* motivation for selling a division of its operations in a manner which adversely affected contingent employee benefits, the sale did not violate ERISA); *Sutton v. Weirton Steel Division,* 724 F.2d 406, 410 (4th Cir.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (making same assumption in affirming summary judgment). Moreover, the fact that the LPG employees were terminated when the LPG operation was sold, whereas employees in other Amoco divisions or operations which were not sold were retained and continued as participants in the Amoco plan, simply does not establish the kind of discrimination prohibited by Section 1140. *Aronson,* 730 F.2d at 16. The termination of plaintiffs' employment with Amoco was merely an incidental result of an entirely legitimate business transaction which ERISA was not designed to regulate or prohibit.

Because there is no evidence on the record of any discrimination or adverse treatment within the prohibitions of Section 1140, the defendants are entitled to judgment as a matter of law with respect to these claims.[35]

---

**34.** As far as Norgas is concerned, the failure to credit prior years of service with Amoco in calculating accrued benefits under the Norgas plan certainly cannot be considered discriminatory, particularly since neither ERISA nor the Norgas retirement plan requires such treatment. In fact, the granting of such credit would arguably constitute favorable discrimination with regard to plaintiffs and a breach of fiduciary duty as to the Norgas plan and its incumbent partici-

pants. *Cf. Winpinsinger v. Aurora Corp. of Illinois, Precision Castings Division,* 456 F.Supp. 559, 566, 569 (N.D.Ohio 1978) (requirement that fiduciary discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries prohibits fiduciary from granting preference as between plan's participants or as between plan's beneficiaries).

**35.** Plaintiffs argue that questions of intent or motive are rarely appropriate for summary

F. *The Claims Under 29 U.S.C. § 1141*

▇▇▇▇ Proceeding directly in the face of all existing precedent as well as the plain language of the statute itself, plaintiffs next claim a right to recover under 29 U.S.C. § 1141, which provides, *inter alia:*

It shall be unlawful for any person through the use of fraud, force, violence, or threat of the use of force or violence, to restrain, coerce, intimidate or attempt to restrain, coerce or intimidate any participant or beneficiary for the purpose of interfering with or preventing the exercise of any right to which he is or may become entitled under the plan [or] this title.... Any person who willfully violates this section shall be fined $10,000 or imprisoned for not more than one year, or both.

*Id.* This section of ERISA is clearly a criminal statute designed to supplement § 1140 by giving law enforcement officials the right to prosecute individuals who fraudulently or coercively interfere with an employee's rights under a pension plan. As every court which has addressed the question has concluded, Section 1141 provides no private right of action whatsoever, but simply allows for criminal prosecution of certain egregious forms of conduct already prohibited by Section 1140. *See, e.g., West v. Butler,* 621 F.2d 240, 243–44 (6th Cir.1980); *Maxfield v. Central States, Southeast and Southwest Areas Health, Welfare and Pension Funds,* 559 F.Supp. 158 (N.D.Ill.1982). Thus, plaintiffs' Section 1141 claim is devoid of legal merit and is due to be dismissed. Enforcement of Section 1141 is the exclusive prerogative of the Attorney General. *See West v. Butler,* 621 F.2d at 244.

G. *The Claims Under 29 U.S.C. § 1022*

▇▇▇▇ Section 1022 of ERISA requires that a "summary plan description" be furnished to participants and beneficiaries and that a "plan description" be filed with the Secretary of Labor. 29 U.S.C. § 1022(a). The plan description and summary plan description are required to contain, among other things,

The name and type of administration of the plan; ... the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; [and] the circumstances which may result in disqualification, ineligibility or denial or loss of benefits ...

29 U.S.C. § 1022(b). Plaintiffs contend that by failing to disclose in the plan description the circumstances which might result in their loss of employment or the possibility that the LPG operation might be sold, Amoco violated the duty imposed by Section 1022 to disclose "the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."

The plaintiffs have no viable claim under Section 1022. That section requires only a description of the *plan itself,* and what general circumstances would cause a loss of eligibility for benefits under the terms of the plan. *See generally* 29 C.F.R. § 2530.102–3(j)–(1) (Department of Labor regulations implementing § 1022). The summary plan description provided by Amoco more than adequately satisfies

---

judgment, citing *Sahadi v. Continental Illinois National Bank and Trust Co.,* 706 F.2d 193 (7th Cir.1983). While this proposition is not without support, it has little application where, as here, the underlying facts are not disputed and the central question to be determined is whether, as a matter of law, the discrimination alleged is the kind of "discrimination" that falls within the proscription of a statute narrowly tailored to serve specific purposes. In any event, to the extent that the court must draw inferences from the undisputed evidentiary facts to determine whether there has been prohibited discrimination, the court in a nonjury case is entitled to draw such inferences and conclusions on mo-

tion for summary judgment if a bench trial would not enhance its ability to draw those inferences and conclusions. *See Coats & Clark, Inc. v. Gay,* 755 F.2d 1506, 1509–10 (11th Cir. 1985); *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123–24 (5th Cir.1978). The ERISA claims made by the plaintiffs in this case are not triable to a jury, *see Calamia v. Spivey,* 632 F.2d 1235 (5th Cir.1980), and it does not appear that any further probative evidence on point would likely be presented at trial. Based on *all* of the evidence before the Court at this time, then, the Court finds that the plaintiffs have not suffered discrimination or other adverse treatment within the prohibitions of Section 1140.

those requirements. It repeatedly refers to the fact that eligibility for benefits will be lost if employment is terminated, and describes the various rights the employee will have under the different benefit plans if that occurs. Thus, the description of the "Retirement Plan" states that "all regular, full-time employees of the company are covered." (Exhibit 1 at 30, Appendix in Support of Amoco's Motion for Summary Judgment at A162). It further states that

> In order to enjoy the full benefits of this plan, you must "retire" from the company. You are retired or not retired depending on your status when you leave the company. You are "retired" if you leave the company—
> —at age 65; or
> —at any time beginning at age 55, when your age plus years of service add up to 75; or
> —at any time for approved disability or with company consent by meeting certain plan requirements.

(*Id*). Immediately following the foregoing, it states in bold-face type that:

> *If you have not satisfied any one of these requirements when you leave the company, you will be a "terminated employee" and not entitled to full benefits of the plan.*

(*Id*). The description goes on to state that "[i]f you leave the company before you have satisfied the requirements for retirement, you will be entitled only to the benefits of a terminated employee—with these benefits based on your years of company service." (Exhibit 1 at 33, Appendix at A163). It then describes in detail the retirement benefits to which a terminated employee is entitled. (Exhibit 1 at 33–34, Appendix at A163–A164).

In view of the foregoing, there clearly was no breach by Amoco of its duty under § 1022 to describe "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." The summary plan description clearly indicates the possibility that employment could be termi-

nated, and that termination prior to the satisfaction of specific equirements would result in the loss of eligibility or denial of benefits in specified respects. Section 1022 imposes no duty for a summary plan description—which, again, is designed to summarize *the terms of the plan*—to go further and enumerate all imaginable future external events which could cause the termination of employment, be it the employee's poor job performance or insubordination, the company's poor economic condition caused by increased competition or a declining demand for the company's products, a decision to abolish a particular job, or, as here, a decision to sell the business to another company.

There being no genuine dispute of material fact as to the § 1022 claims, the Court concludes that defendants Amoco and Bearden are entitled to judgment as a matter of law.[36]

### H. *The Claims Under 29 U.S.C. § 1024*

Finally, the plaintiffs claim that Amoco's decision to sell the LPG facilities was a plan "modification or change which Amoco should have reported to the Secretary under the requirements of [29 U.S.C.] § 1024." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 36). Again, this claim is utterly specious. The undisputed evidence establishes that the LPG sale did not involve any change, amendment or modification of the terms of any of Amoco's benefit plans. Rather, plaintiffs' employment with Amoco was simply terminated at the time of the sale. Plaintiffs received all benefits to which they were entitled at that time under the terms of the *existing plan*, and non-terminated employees had the same rights under the plan as before the sale. In short, the sale effected no modification in the terms of the Amoco plan or the conditions for eligibility under the plan; it simply effected a termination of the *employment* of the plaintiffs and other LPG em-

---

**36.** No claim has been made under Section 1022 against Norgas, which obviously had no duty of reporting or disclosure with respect to the Amoco plan.

ployees.[37] Consequently, Amoco was not obligated to report the sale as a modification in the terms of the plan under Section 1024.[38]

For these reasons, defendant Amoco is entitled to judgment as a matter of law with respect to the claims made under 29 U.S.C. § 1024.[39]

## CONCLUSION

Based on the foregoing analysis, the Court concludes that as to each and every one of the plaintiffs' claims, there exists no genuine issue of material fact, and that defendants are entitled to judgment as a matter of law. The plaintiffs' attempts to convert a routine business transaction into a series of state and federal wrongs are based upon severely strained interpretations of law to which this Court cannot accede. An appropriate order will be entered.

---

**37.** Even where the terms of a proposed sale of a business do involve amendments of existing plans, neither Section 1022 nor Section 1024 requires an employer to supply information regarding amendments before the amendments are effected. *Sutton v. Weirton Steel Division,* 567 F.Supp. 1184, 1196 (N.D.W.Va.1983), *affirmed* 724 F.2d 406 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

**38.** In any event, the Court is of the opinion that Section 1024 provides no *private* cause of action for failure to report modifications *to the Secretary* (as opposed to the failure to comply with the duties of reporting and disclosure owed to participants and beneficiaries). Therefore, even assuming that the sale did constitute a "modification" of the plan within the meaning of Section 1024, the plaintiffs would have no right to recover the damages they seek based upon Amoco's failure to properly report the modification to the Secretary.

**39.** Plaintiffs have made no claim against Norgas under Section 1024.